Digit. Realty Tr., Inc. v. Sprygada, 2022 NCBC 31.

STATE OF NORTH CAROLINA

WAKE COUNTY

DIGITAL REALTY TRUST, INC.;
DIGITAL REALTY TRUST, L.P.; and
DLR LLC,

Plaintiffs,

v.

PETER SPRYGADA,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 14999

ORDER AND OPINION ON
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
[REDACTED]

1.      THIS MATTER is before the Court on Plaintiffs Digital Realty Trust,

Inc. (the "REIT"), Digital Realty Trust, L.P., and DLR LLC's ("DLR"; collectively,

"Digital Realty" or the "Company") Motion for Preliminary Injunction (the "Motion")

pursuant to Rule 65 of the North Carolina Rules of Civil Procedure (the "Rule(s)") and

N.C.G.S. § 1-485. (ECF No. 39.)

2.      Having considered the Motion; the briefs, exhibits, and affidavits

supporting and opposing the Motion; and the parties' arguments at a hearing held on

13 June 2022, the Court GRANTS in part and DENIES in part the Motion as provided

herein.[1]

> *Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by J. Allen Thomas
> and Vanessa N. Garrido, for Plaintiffs Digital Realty Trust, Inc., Digital
> Realty Trust, L.P., and DLR LLC.*
>
> *Ellis & Winters LLP, by Steven A. Scoggan, Jonathan D. Sasser,
> and Jeffrey S. Warren, for Defendant Peter Sprygada.*

---

[1] Because some material in this dispute involving confidential technology has been filed
under seal, the Court initially filed this Order and Opinion under seal and permitted the
parties to propose redactions. The Court has considered the parties' proposals and now
finalizes this Order and Opinion for the public docket.

Earp, Judge.

## I. INTRODUCTION AND PROCEDURAL HISTORY

3.    This dispute arises from Defendant Peter Sprygada's ("Sprygada") decision to end his employment with Digital Realty and to commence employment with Itential, Inc. ("Itential"). Digital Realty alleges that Itential is a competitor, that both it and Itential are engaged in technological advances to bring new network automation products and services to market, and that Sprygada, who was central to that effort for Digital Realty, terminated his employment with Digital Realty to join its competitor.

4.    Digital Realty filed its Verified Complaint on 8 November 2021 asserting claims against Sprygada for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.[2] It seeks injunctive relief, as well as actual and punitive damages.[3] (*See generally* Compl., ECF No. 3.)

5.    Digital Realty's current Motion, filed 19 April 2022, seeks injunctive relief with respect to Digital Realty's breach of contract claim arising from Sprygada's alleged violation of non-competition covenants. (ECF No. 39.)

---

[2] Digital Realty's claim for conversion was voluntarily dismissed on 27 January 2022. (ECF No. 19.)

[3] Plaintiffs currently have a pending Motion to Amend to assert additional claims and add parties. (ECF No. 56.)

6. The Motion has been fully briefed and was argued at a hearing on 13 June 2022, at which all parties were represented by counsel. It is now ripe for determination.

## II. FINDINGS OF FACT[4]

7. The Court makes the following findings of fact solely for the purpose of deciding this Motion. These findings are not binding on future proceedings. *See Lohrmann, v. Iredell Mem'l Hosp., Inc.,* 174 N.C. App. 63, 75 (2005) ("It is well settled that findings of fact made during a preliminary injunction proceeding are not binding upon a court at a trial on the merits."); *Schloss v. Jamison,* 258 N.C. 271, 277 (1962) (findings of fact on injunction not binding on ruling on the merits).

8. Digital Realty is a "global provider of data center, colocation, and interconnection solutions" for customers across a variety of industries. In addition to owning nearly three hundred data centers throughout the United States, Europe, Latin America, Asia, Australia, Africa, and Canada, the Company engages in other business to improve interconnection capabilities for its customers, including software development designed to advance network automation services. (Compl. ¶¶ 8–10; Affidavit of Chris Sharp ¶¶ 4, 10–11, 24 [hereinafter "Sharp Aff."], ECF No. 71.2.)[5]

---

[4] Any determination later stated as a Conclusion of Law that should have been stated as a finding of fact is incorporated in these Findings of Fact. Citations to the record herein are not exhaustive and do not necessarily reflect all evidence upon which corresponding findings of fact are based.

[5] Portions of the record have been sealed by order of the Court. *See* Order on Motions to Seal, ECF No. 70. The Sharp Affidavit is located at ECF No. 71.2 (public). Those portions permitted to be under seal are located at ECF No. 40.1 (under seal).

9.     The REIT is a Maryland Corporation with its headquarters in Austin, Texas. It is a publicly traded real estate investment trust and the sole general partner of Digital Realty Trust, L.P., a Maryland limited partnership, through which it conducts its business and owns its assets. (Compl. ¶¶ 1–2.) DLR is a Maryland limited liability company and a subsidiary of Digital Realty Trust, L.P. DLR is the Company's "principal employing entity" in the United States. (Compl. ¶ 3.)

10.     Sprygada is a citizen and resident of Cary, North Carolina. He was formerly employed by and worked for DLR in North Carolina. (Compl. ¶ 4.)

### Digital Realty Acquires Pureport

11.     On 10 February 2021, in furtherance of its efforts to develop network automation products and services, the Company paid more than ▮▮▮▮▮▮ to acquire Pureport, Inc. ("Pureport"), a "multi-cloud access solution firm." (Sharp Aff. ¶ 25.) Among other things, Pureport built network automation software, and one of its offerings was a product known as "multicloud fabric." (Dep. Rich Lee 18:6–16 [hereinafter "Lee Dep. I"], ECF No. 71.4.)[6]

12.     Prior to the acquisition, Sprygada served as Pureport's Chief Technology Officer ("CTO"). In that role, Sprygada "led Pureport's product management, software engineering, and network operations teams." (Compl. ¶¶ 10–13; see Sharp Aff. ¶ 23; Sharp Aff. Ex. 1, at PL00044 [hereinafter "LinkedIn"].) As the person responsible for running Pureport's technical operations, Sprygada was one of three

---

[6] The Lee deposition excerpts are located at ECF No. 71.4 (public) and ECF No. 61.2 (under seal).

senior employees second in importance only to Pureport's Chief Executive Officer. (Lee Dep. I 17:17–18:2, ECF No. 61.2 (under seal).)

13.     Although the Company sought to acquire Pureport for several reasons, gaining its network automation technology, as well as the network automation expertise of its employees, was principal in its decision to purchase Pureport's assets. (Sharp Aff. ¶ 19; Lee Dep. I 32:13–22 (under seal).)   Consequently, as part of this acquisition, the Company hired Pureport's intellectual property and engineering personnel, including Sprygada.   (Compl. ¶¶ 10–13; LinkedIn, at PL00043–44.) Sprygada's technical abilities, including his expertise in the development of network automation products and services were instrumental in motivating Digital Realty to acquire Pureport's assets.  (Compl. ¶¶ 29–30.)

14.     At the time of the acquisition, Sprygada had vested shares equating to a ▮▮▮▮ ownership interest in Pureport that he received through an option plan.  (Lee Dep. I 36:12–17 (under seal); Sharp Aff. ¶ 21, ECF No. 40.1 (under seal).)   Pureport informed Digital Realty that Sprygada owned shares of the business.  (Sharp Aff. ¶ 21 (under seal).)  Digital Realty also believes that Sprygada received an equity payout of approximately ▮▮▮▮▮ as a result of the acquisition, although Sprygada denies having received any such payout, and the Court does not resolve this dispute for purposes of this Motion.  (Compl. ¶ 14; Sharp Aff. ¶ 21 (under seal);  Dep. Brandon Tikalsky 32:22–25 [hereinafter "Tikalsky Dep."][7], ECF No. 50.3 (under seal); Answer ¶ 14, ECF No. 7.)

---

[7] The Tikalsky deposition excerpts are located at ECF No. 72.5 (public) and ECF No. 50.3 (under seal).

15. Sprygada describes his role at Pureport on his LinkedIn.com profile as being responsible for setting the "overall strategic direction for Pureport's Multicloud Fabric[,]" which is Pureport's network automation service. He also states that his role at Pureport involved working "in conjunction with customers to evolve cloud native networking to meet the challenges of multi and hybrid cloud requirements." (Sharp Aff. ¶ 22; LinkedIn, at PL00044.)

16. The Asset Purchase Agreement ("APA") between Digital Realty and Pureport defines Sprygada ███████████████████████████████████ ████████████████████████████████. (Sharp Aff. ¶ 26; Asset Purchase Agr. 61 [hereinafter "APA"], ECF No. 40.1, Ex. 2 (under seal).[8]

17. Sprygada was also identified in the APA ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████. (Empl. Agr. ¶¶ 2–3, ECF No. 3.1; Sharp Aff. ¶¶ 27–28, ECF No. 40.1 (under seal); APA at Sch. 2.5(e)(ii) (under seal).)

18. ████████████ is the Company's name for its effort ██████████ ████████████████████████ products and services. (Sharp Aff. ¶ 27 (under seal).) ████████████████████████." Within the industry, "network automation" and "network orchestration" generally refer to services that make connectivity and

---

[8] The Asset Purchase Agreement is located at ECF No. 72.3 (public) and ECF No. 50.1 (under seal).

operation of a network easier for customers. (Sharp Aff. ¶ 9.) Digital Realty's goal for ████████ is to █████████████████████████████████████████ ████████████████████████████████████████." (Sharp Aff. ¶ 27 (under seal).)

19. At the time of the acquisition, Pureport had not developed ███████ █████████████████; however, during the due diligence period prior to the transaction closing, Pureport showed Digital Realty how their technology could be augmented to achieve Digital Realty's ███████████ network automation goals. (Sharp Aff. ¶ 16.)

20. Sprygada was assigned the highest percentage of ████████████████ ██████████████. (Lee Dep. I 37:19–23 (under seal); Sharp Aff. ¶ 28 (under seal).) And, as Pureport's CTO, Sprygada provided technical advice in developing these performance milestones. (Aff. Peter Sprygada ¶ 16 [hereinafter "Sprygada Aff."], ECF No. 72.2.[9])

21. After completion of the first performance milestones, Pureport attempted to distribute some of the Earnout Amount to Sprygada, but Sprygada instructed Pureport to "hold off." (Lee Dep. I 46:20–47:3 (under seal).)

22. As one of two ███████████ transferred to Digital Realty, Section 6.2(f) of the APA required Sprygada to sign an employment agreement, (APA, at § 6.2(f); Empl. Agr.), which included a requirement that he "review, sign, and abide by" the Company's Employee Confidentiality and Covenant Agreement (the "ECCA"), (Employee Confidentiality & Covenant Agr. [hereinafter "ECCA"], ECF No. 3.2).

---

[9] The Sprygada Affidavit is located at ECF No. 72.2 (public) and ECF No. 50.1 (under seal).

Therefore, contemporaneous with his signing of the offer letter, Sprygada also executed the ECCA. (Compl. ¶ 20; Sharp Aff. ¶ 29.)

23. The ECCA states that it was executed between the REIT, DLR (also called the "Employment Company"), "and their respective subsidiaries and affiliates" (collectively referred to as the "Company"), on the one hand, and Sprygada, on the other hand. (*See* ECCA, at 1.)

24. The offer of employment extended to Sprygada as part of the transaction was contingent on "Closing" as defined in the APA.[10] If Closing did not occur for any reason, the offer of employment would be null and void. (Empl. Agr. ¶ 8.) The employment agreement specifies that Sprygada was employed at will. (Empl. Agr. ¶ 5.)

25. The Closing was successfully completed on 10 February 2021. (Sharp Aff. ¶ 25.)

26. Sprygada's title for Digital Realty was "Chief Architect." In this role he was entrusted with complete technical responsibility for ██████ ██████, the Company's "global fabric orchestration and service delivery platform," and he led a team working to achieve the performance milestones identified in the APA. (Compl. ¶ 18; Sharp Aff. ¶¶ 31, 34 (under seal).)

27. In this new role with Digital Realty, Sprygada not only used the proprietary information he had developed and used for Pureport, but he also

---

[10] Another entity, Digital Porpoise, LLC, was identified along with the REIT as "Buyer" in the purchase agreement. The relationship between Digital Porpoise, LLC and Digital Realty is not explained in the pleadings.

developed, had access to, and regularly used the Company's Confidential Information with respect to its network automation division. (Compl. ¶¶ 28, 34.)

28. Sprygada was the "driving force" in developing ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████. This was a key strategic decision that originated with Sprygada and that changed the direction of ████████████. (Sharp Aff. ¶¶ 36–38 (under seal).)

<u>The ECCA</u>

29. Section 8 of the ECCA sets forth non-competition obligations that are specifically divided into two parts. Subsection 8(a) references the acquisition of Pureport and states as follows:

> **In connection with the sale of substantially all of the assets of [Pureport] pursuant to the Asset Purchase Agreement**, Employee agrees that from the Closing Date[11] and for a period of three (3) years thereafter, Employee shall not, directly or Indirectly,[12] for or with a **Competing Business**, engage in any activity (as employee, owner, consultant, partner, or in any other capacity) that is the same as or similar to the **Acquired Business** as of the Closing Date, Employee understands that this restriction is limited to (a) the Restricted Territory or (b) anywhere in the world where Employee's activities for a Competing Business will require Employee to use and/or disclose the Company's Confidential Information or Trade Secrets.

(ECCA, at § 8(a) (emphasis added).)

---

[11] "Closing Date" is defined as the "date of the closing of the transactions contemplated by the Asset Purchase Agreement," which was 3 February 2021. (ECCA, at § 1(f).)

[12] "Indirectly" means that "[Sprygada] will not assist others in performing those activities [Sprygada] is prohibited from engaging in directly pursuant to the terms of [the ECCA]." (ECCA, at § 1(k).)

30. "Competing Business" is defined in the ECCA as "any individual (including Employee) or entity (in whole or in part), including any Customer or vendors, that is engaged, on behalf of itself or others, in any way, in the **Business of the Company** or that is taking material steps to engage in such business." (ECCA, at § 1(g) (emphasis added).)

31. "Business of the Company" is defined in the ECCA as:

> **any and all business activities of the type engaged in by the Company, including but not limited to** (i) acquiring, developing, owning, or operating data centers and/or equipment or systems used therein, (ii) providing of colocation, interconnection, or cloud enablement services, (iii) the acquisition (in whole or in part), possession, or disposition of interest in, taking of leasehold interest in, taking any equity interest in, financing of, lending of funds to, management of, and participating in any way in the design or construction of commercial real estate buildings used principally (A) to provide infrastructure required by companies in the data, voice, and wireless communications industry; (B) to provide the physical environment required for businesses in disaster recovery, IT outsourcing, and colocation industries; (C) to provide highly specialized manufacturing environments used for the manufacture of technology products or (D) as headquarter office facilities for technology companies, and **(iv) the Acquired Business.**

(ECCA, at § 1(e) (emphasis added).)

32. The "Company" is defined in the opening paragraph of the ECCA to mean the REIT, DLR, "and their respective subsidiaries and affiliates." (ECCA, at 1.)

33. The "Acquired Business" is defined in the ECCA to mean:

> **any and all business or activities of the type engaged in by [Pureport] as of the Closing Date**, including but not limited to designing, developing, maintaining, supporting, marketing, licensing, distributing, commercializing, selling or operating any offerings and/or services related to cloud network solutions, including solutions that

allow organizations to connect workloads or data centers running in separate clouds.

(ECCA, at § 1(b) (emphasis added).)

34. Subsection 8(b) of the ECCA is stated as a condition of employment (which, itself, is conditioned on the Closing), and provides:

> **As a condition to Employee's acceptance of employment** pursuant to the offer letter to which this Agreement is an exhibit, Employee agrees that during Employee's employment and for a period of two (2) years following the Last Day, Employee shall not, directly or Indirectly, for or with a Competing Business, engage in any activity (as employee, owner, consultant, partner, or in any other capacity) **that is the same as or similar to the Business of the Company and upon which Employee worked or which related to any direct or indirect responsibilities Employee had at the Company** during the two (2) years prior to the Last Day.[13] Employee understands that this restriction is limited to (a) the Restricted Territory or (b) anywhere in the world where Employee's activities for a Competing Business will require Employee to use and/or disclose the Company's Confidential Information or Trade Secrets.

(ECCA, at § 8(b) (emphasis added).)

35. For both Sections (a) and (b), "Restricted Territory" is defined as "(i) within the State of North Carolina; (ii) the United States; (iii) North America, (iv) South America, (v) Europe, (vi) Asia, (vii) Australia, and (viii) Africa." (ECCA, at § 1(q).)

### Sprygada Joins Itential

36. Sprygada worked for DLR from 3 February 2021 until August 2021, when he resigned to accept the position of Vice President, Product Management with

---

[13] "Last Day" is defined as the "Employee's last day of employment with the Company, regardless of the reason for Employee's separation[.]" (ECCA, at § 1(o).)

Itential. (Compl. ¶¶ 36, 38.) Itential focuses on "providing network automation platforms that enable its customers to use its automation services to manage their network infrastructure." (Compl. ¶ 39.)

37. In January 2021, Christopher Wade, CTO for Itential, memorialized his thoughts for Itential's strategic direction. Included in his summary was ███████████

████████████████████████████████████    ████████████████████████████

████████████████████████████████████████████████████████████████████

████████." (Itential Strategy Thoughts, ECF No. 61.3 (under seal).[14])

38. Similarly, Digital Realty's Service Fabric Product Strategy details a five-year roadmap for the development of its network automation platform. Digital Realty reasoned that "hybrid IT solutions are becoming increasingly complex. This necessitates an orchestration entity that can create complex service combinations that enable workloads and the network connectivity between physical server deployments operating the workloads." (Service Fabric Product Strategy, Sharp Aff. Ex. A, ECF No. 40.1 (under seal).[15]) Digital Realty's target customer ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████." (Service Fabric Product Strategy, Sharp Aff. Ex. A (under seal).)

---

[14] Itential's document is located at ECF No. 68.3 (public) and ECF 61.3 (under seal).

[15] The Service Fabric Product Strategy is located at ECF No. 46.3 (public) and ECF No. 40.1 (under seal).

39.    Furthermore, Pureport formerly offered and Itential currently offers some of the same services to their customers.  In particular, both companies provide services that make it easier for customers to manage their private and cloud networks, including the management of workflows across networks and IT services. (Sharp Aff. ¶ 17.) Itential's strategic focus on network automation platforms has the potential to be competitive with the network automation products and services that Sprygada, using technology from Pureport, was developing for Digital Realty prior to his resignation.  (Compl. ¶ 40.)

40.    Sprygada's LinkedIn.com profile describes his responsibilities at Digital Realty as "[l]ead an engineering and architecture team tasked with building a global fabric orchestration and service delivery platform *as acquired from Pureport* . . . . Continue to evangelize the benefits of building a network fabric software orchestration and automation platform both internally and externally." (LinkedIn, at PL00043 (emphasis added).)

41.    At the time he left Digital Realty, Sprygada and his team on ███████ ██████ had already begun development of the network automation products and services necessary for a global fabric orchestration and service delivery platform. The team was also in the process of ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. (Tikalsky Dep. 63:13–65:18 (under seal).)

42.     Sprygada's LinkedIn.com profile for his position at Itential says that he is now "[d]elivering industry leading network automation platforms designed to allow customers to take advantage of software to help lower the operational cost of managing today's heterogeneous networks" and "[m]anag[ing] the product management team responsible for all of Itential's innovate (sic) products and solutions." (LinkedIn, at PL00043.)

43.     Itential's promotional materials and Sprygada's public statements since joining Itential indicate that Itential is expanding its network automation offerings and that Sprygada is involved in that effort. (Sharp Aff. ¶¶ 46–49; *see* LinkedIn, at PL00043.)

44.     Among other statements, Sprygada is quoted as saying, "Joining Itential offers a unique opportunity to help guide a strategic and inventive team committed to reaching new levels of success by providing powerful network automation software to all organizations." (Sharp Aff. ¶¶ 46–49; *see* LinkedIn, at PL00043.)

45.     Approximately six weeks before filing this Motion, Digital Realty became aware of publicly available presentations Sprygada has made that detail Itential's network automation services and provide some information regarding Sprygada's duties for Itential. (Sharp Aff. ¶¶ 52–57.)

46.     Sprygada's statements in these presentations (*e.g.*, that "Itential is actually bringing a whole portfolio of products to market to address end-to-end

automation needs of enterprises;" that he is defining the business and technical roadmaps for these products and telling engineers how to develop them; that Itential is developing "pre-built collections" █████████████████████████████████████ █████████████████████████; that Itential's network automation software will be available in the cloud and it is moving away from an on-premise only application ████ ████████████████████████████; and that Itential is developing "drag and drop" concepts ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ indicate that he is doing work for Itential that is substantially similar to the work he did for with Pureport and then for Digital Realty with █████ ██████. (Sharp Aff. ¶¶ 55, 57 (under seal).)

47. In his supplemental response to Digital Realty's First Interrogatories, Sprygada describes the nature of the services he was hired to perform and has performed for Itential as being focused "on building out Itential, Inc.'s product management organization, which includes creating and managing forward-looking roadmaps for Itential's three primary products, Itential Automation Platform, Itential Automation Gateway, and Itential Cloud." (Sharp. Aff. Ex. B, ECF No. 40.1, at Ex. B.) In addition, Sprygada states that he "manages a team that defines the business and technical roadmaps for those products. The roadmaps are then given to engineers who are responsible for using those roadmaps to build and improve the Itential products mentioned above." (Sharp Aff. Ex. B.) Finally, Sprygada states that

he "publishes marketing pieces to bring brand awareness to Itential's product portfolio." (Sprygada's Suppl. Resp.)

48. Itential's marketing materials and Sprygada's statements indicate that as Vice President, Product Management, Sprygada may be engaged in work for Itential that he would have performed for Digital Realty had he remained employed. (Compl. ¶¶ 41–42.)

## III.    CONCLUSIONS OF LAW

49. The Court has jurisdiction over the parties and subject matter of this action.

50. Digital Realty contracted to buy Pureport's assets with the understanding that Sprygada would continue to use the knowledge and expertise he was using at Pureport to develop Digital Realty's next generation network automation products and services. The ECCA was intended to memorialize Digital Realty's agreement with Sprygada with respect to this understanding.

51. A preliminary injunction is an "extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *Ridge Cmty. Invs., Inc. v. Berry*, 293 N.C. 688, 701 (1977). Digital Realty bears the burden to establish the "right to a preliminary injunction[,]" *Pruitt v. Williams*, 288 N.C. 368, 372 (1975), and it must show: (1) a likelihood of success on the merits, and (2) that it is likely to sustain irreparable loss unless the injunction is issued or, "if in the opinion of the Court, issuance is necessary for the protection of [Plaintiffs'] rights during the course of litigation[,]" *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401 (1983) (citation

omitted); *see also Bd. of Provincial Elders v. Jones*, 273 N.C. 174, 182 (1968) (the burden is on the applicant); *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508 (2004) (a preliminary injunction will issue only upon the movant's showing of these two factors); N.C.G.S. § 1-485; N.C. R. Civ. P. 65. "Likelihood of success means a 'reasonable likelihood.' " *Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 9, at *11 (N.C. Super. Ct. Feb. 3, 2017) (quoting *A.E.P. Indus., Inc.*, 308 N.C. at 404).

52. Injunctive relief is not appropriate where there is a "full, complete and adequate remedy at law." *Bd. of Light and Water Comm'rs of the City of Concord v. Parkwood Sanitary Dist.*, 49 N.C. App. 421, 423 (1980). However, irreparable injury may exist when "the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *A.E.P. Indus., Inc.*, 308 N.C. at 406 (emphasis omitted).

53. In addition to these requirements, the Court must balance the equities by weighing the potential harm Digital Realty will suffer if no injunction is entered against the potential harm to Defendant if an injunction is entered. *See Addison Whitney, LLC v. Cashion et al.*, 2017 NCBC LEXIS 23, at *12–13 (N.C. Super. Ct. Mar. 15, 2017) (citing *Williams v. Greene*, 36 N.C. App. 80, 86 (1978)).

54. For the reasons stated below, the Court determines that Digital Realty is entitled to a preliminary injunction, but only with respect to the terms of Section 8(a) of the ECCA.

## A. Likelihood of Success on the Merits

55. As detailed herein, the Court concludes that Digital Realty has shown a reasonable likelihood of success with respect to Section 8(a) of the ECCA, but Plaintiffs have not carried their burden with respect to Section 8(b).

56. While covenants not to compete are valuable tools when used in the right circumstances, courts generally view them as disfavored restraints on trade. *See, e.g., Washburn v. Yadkin Valley Bank & Trust Co.*, 190 N.C. App. 315, 323 (2008) ("Covenants not to compete restrain trade and are scrutinized strictly."); *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 311 (1994) ("A covenant in an employment agreement providing that an employee will not compete with his former employer is not viewed favorably in modern law." (citation omitted)), *disc. review denied*, 339 N.C. 612 (1995); *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 279 (2000) ("Covenants not to compete . . . are not viewed favorably in modern law." (citation omitted)).

57. Therefore, among other things, covenants not to compete must be tailored to protect legitimate business interests to be enforceable. *See, e.g., VisionAIR*, 167 N.C. App. at 508 ("To be valid, the restrictions on the employee's future employability by others 'must be no wider in scope than is necessary to protect the business of the employer.' " (quoting *Manpower of Guilford Cnty., Inc. v. Hedgecock*, 42 N.C. App. 515, 521 (1979)); *Sterling Title Co. v. Martin*, 266 N.C. App. 593, 597 (2019) (an "otherwise procedurally valid covenant not to compete" must still

be "designed to protect a legitimate business interest of the employer" (citation omitted)).

58.    Identifying the legitimate business interest to be protected depends on the circumstances, and some interests are more obvious than others. In North Carolina, for example, a covenant that arises from the sale of a business (where it is apparent that the purchaser has a legitimate interest in protecting the assets just purchased) is subject to a different level of scrutiny than the typical employment covenant (where the business interest to be protected may not be as apparent). *See e.g., Keith v. Day,* 81 N.C. App. 185, 193 (1986) ("We recognize the distinction between covenants not to compete in connection with the sale of a business and covenants not to compete in connection with a contract of employment. The latter are more closely scrutinized than the former."); *Outdoor Lighting Perspectives Franchising v. Harders,* 228 N.C. App. 613, 620 (2013) ("According to well-established North Carolina law, non-competition agreements contained in an employment contract are 'more closely scrutinized than' those contained in a contract for the sale of a business.") (citing *Keith,* 81 N.C. App. at 193)); *Azko Nobel Coatings, Inc. v. Rogers,* 2011 NCBC LEXIS 42, at *30 (N.C. Super. Ct. Nov. 3, 2011) ("Non-compete covenants which accompany a sale of business generally are afforded more latitude than covenants ancillary to employment contracts.").

59.    With respect to the sale of a business, trade secrets or other proprietary and confidential information, and other intangibles, such as goodwill with customers, suppliers, and other third parties, are legitimate interests that may be protected by

noncompetition covenants. *See, e.g., Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 663 (1968) ("The modern rule permitting the sale of good will recognizes that one who, by his skill and industry, builds up a business, acquires a property right in the good will of his patrons and that this property is not marketable unless the owner is at liberty to sell his right of competition to the full extent of the field from which he derives his profit and for a reasonable length of time[.]" (internal quotation marks and citation omitted)).

60. On the other hand, because the law recognizes that a power imbalance may exist between employers and employees, determining the reasonableness of a noncompete in the employment context requires a closer examination. *See, e.g., Keith*, 81 N.C. App. at 193. As the Supreme Court observed more than a half century ago, "[a] workman who has nothing but his labor to sell and is in urgent need of selling that may readily accede to an unreasonable restriction at the time of his employment without taking proper thought of the morrow[.]" *Beam v. Rutledge*, 217 N.C. 670, 673–74 (1940) (citation and internal quotation marks omitted).

61. At bottom, whether a noncompete in either scenario is enforceable turns on whether the restraint on trade is no more restrictive than necessary to protect the legitimate business interest implicated. *Outdoor Lighting Perspectives Franchising, Inc.*, 228 N.C. App. at 620–624 (analyzing as a "hybrid" a covenant contained in a franchise agreement); *Carlson Env't Consultants, PC v. Slayton*, 2017 U.S. Dist. LEXIS 154191, at *20–26 (W.D.N.C. Sept. 1, 2017) (analyzing noncompete signed in consideration of employment that also arose from the sale of a business). Ultimately,

"the reasonableness of a restraining covenant is a matter of law for the court to decide." *Jewel Box Stores Corp.*, 272 N.C. at 663.

62.     In the case currently before the Court, the evidence indicates that Sprygada was both a minority owner of Pureport and one of three employees the CEO considered to be his second in command. In both of these roles, he benefitted from the sale of Pureport to Digital Realty. It is also apparent from the language and timing of the employment agreement that Sprygada's employment with Digital Realty was conditioned on and part of the larger transaction between Pureport and the Company.

63.     Perhaps because of the roles Sprygada played as both minority owner and high-level employee, the non-competition restrictions in the ECCA are separated into two parts: Subsection 8(a), which states that it is "in connection with" the APA and measures the time for compliance from the Closing Date of the sale; and Subsection 8(b), which states that it is "a condition to [Sprygada]'s acceptance of employment" and applies during his employment with Digital Realty and for a period of two years thereafter.

64.     The Court analyzes each of these obligations with the requisite level of scrutiny, keeping in mind that the ultimate determination depends on whether each restraint is no more restrictive than necessary to protect the legitimate business interests implicated. *Outdoor Lighting Perspectives Franchising, Inc.*, 228 N.C. App. at 620–624.

### i. Section 8(a) of the ECCA

65. Section 8(a) of the ECCA provides:

In connection with the sale of substantially all of the assets of [Pureport] pursuant to the Asset Purchase Agreement, Employee agrees that from the Closing Date and for a period of three (3) years thereafter, Employee shall not, directly or indirectly, for or with a Competing Business, engage in any activity (as employee, owner, consultant, partner, or in any other capacity) that is the same as or similar to the Acquired Business as of the Closing Date, Employee understands that this restriction is limited to (a) the Restricted Territory or (b) anywhere in the world where Employee's activities for a Competing Business will require Employee to use and/or disclose the Company's Confidential Information or Trade Secrets.

(ECCA, at § 8(a).)

66. A breach of contract claim requires the existence of a valid, enforceable contract and a breach of its terms. *Window Gang Ventures, Corp. v. Salinas*, 2018 NCBC LEXIS 18, at *17 (N.C. Super. Ct. Feb. 21, 2018) (citing *J. T. Russell & Sons, Inc. v. Silver Birch Pond, LLC*, 218 N.C. App. 290, 295 (2011)). When the contract limits the rights of a person to do business in North Carolina, it must also be in writing and signed by the person restricted. N.C.G.S. § 75-4.

67. Our Supreme Court has stated that it "will enforce a covenant not to compete made in connection with the sale of a business '(1) if it is reasonably necessary to protect the legitimate interest of the purchaser; (2) if it is reasonable with respect to both time and territory; and (3) if it does not interfere with the interest of the public.' " *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 698 (2016) (quoting *Jewel Box Stores Corp.*, 272 N.C. at 662–633).

68. There is no question that the ECCA is a writing signed by Sprygada. But Sprygada argues (i) that the ECCA is not an enforceable contract because it is

not supported by consideration separate and distinct from his employment with Digital Realty and, relatedly, (ii) that Section 8(a) should not be analyzed as a sale-of-business covenant because he did not receive payment for his alleged ownership interest in Pureport. Specifically, Sprygada argues that the defined "Seller" in the APA was Pureport, and that his role was only that of an employee. Moreover, because the ECCA is titled "*Employee* Confidentiality and Covenant Agreement" and contains introductory language stating that it was signed "in consideration of the Company's initial or continued employment of [Sprygada]," (ECCA, at 2), Sprygada contends that Subsection 8(a) should be subjected to the higher level of scrutiny that is used to analyze non-competition provisions in employment agreements, rather than as an obligation arising from a business sale agreement. (Def.'s Br. Opp'n Pls.' Mot. Prelim. Inj. 15, 18–19 [hereinafter "Def. Opp'n Br."], ECF No. 72.1.)

69.     The Court first determines that the evidence presented in support of the Motion is sufficient to satisfy the Company's burden to show that the contract is supported by consideration. The APA plainly indicates that, as a result of the acquisition, Sprygada received employment with Digital Realty, a salary or other base compensation, and the potential for Earnout Amounts.

70.     For multiple reasons, the Court also concludes that Section 8(a) of the ECCA is subject to the law as established in *Jewel Box Stores Corp.* and its progeny. First, the plain language of Subsection 8(a) of the ECCA establishes that it is "in connection with the sale of substantially all of the assets of the Seller pursuant to the Asset Purchase Agreement[.]" Further, the evidence indicates that, while there,

Sprygada played an important role in the development of particular technology that attracted Digital Realty and led to the acquisition. The ECCA was one of several agreements executed as a result of the acquisition and was conditioned on its closing. Thus, the scrutiny required for business sale agreements is the appropriate standard for Section 8(a).

71.     But even if the more exacting scrutiny afforded employment covenants generally is used, the Court concludes that Section 8(a) meets the test. Sprygada's leadership role, first at Pureport and then at Digital Realty, put him in a position of authority over Pureport's developing technology—technology that Digital Realty considered to be an asset that transferred in the sale. Those circumstances, which gave Sprygada considerable power over an asset, equate to the power over assets an owner would have in different circumstances. *See Seaboard Indus., Inc. v. Blair*, 10 N.C. App. 323 (1971).

72.     In *Seaboard Industries*,[16] the Court of Appeals observed that "[i]t may well be . . . that plaintiff is not entitled to have the covenants contained in the employment contract now before us interpreted with the latitude afforded those related to the sale of a business, in that defendant was not the seller, and owned none of the stock of either company purchased by plaintiff." *Id.* at 333. However, the Court found that "the circumstances surrounding the purchase of the companies by plaintiff [were] particularly pertinent to the question of whether the covenant agreed by defendant . . . was reasonably necessary to protect plaintiff's interest." *Id.* at 334.

---

[16] The Court of Appeals applied Georgia law, which it determined to be "identical" to the general principles that prevail in North Carolina. *Seaboard Indus., Inc.*, 10 N.C. App. at 331.

And although the defendant had never owned an interest in the company, "[h]e was familiar with the company's customers, suppliers and brokers, and was well experienced in the [industry]." *Id.* Significantly, the Court of Appeals noted that the company "would obviously have been worth less than the substantial amount invested by plaintiff if its experienced manager had been free to terminate his contract and compete with the acquiring company by dealing with its customers, brokers, suppliers, and others, many of whom he had undoubtedly personally developed." *Id.* at 335. So too, here.

73. Regardless of which level of scrutiny applies, Sprygada argues that Section 8(a) is inapplicable because Itential is not a "Competing Business,"[17] as that term is defined in the ECCA. Then, assuming *arguendo* that it is, Sprygada argues that *Medical Staffing Network v. Ridgeway*, 194 N.C. App. 649 (2009), establishes that the scope of the noncompete is too broad because it impermissibly prevents him from engaging in *any* activity for a "Competing Business" that "is the same or similar to [Pureport,]" regardless of whether he had any involvement in that particular activity while working for Pureport. (Br. Supp. Def.'s Mot. J. Pldgs. 10–11, ECF No. 9.)

74. The Court concludes that Digital Realty has presented sufficient evidence to satisfy its burden at this stage that Itential is a Competing Business. It

---

[17] Competing Business" is defined as "any individual (including Employee) or entity (in whole or in part), including any Customer or vendors, that is engaged, on behalf of itself or others, in any way, in the **Business of the Company** or that is taking material steps to engage in such business." (ECCA, at § 1(g) (emphasis added).) "Business of the Company" is defined as: **any and all business activities of the type engaged in by the Company[.]"** (ECCA, at § 1(e) (emphasis added).)

has presented evidence that Itential is engaged in the development and sale of advanced network automation products and services designed to meet the challenges of the evolving "hybrid" environment in which customers store and use their data. At Pureport, Sprygada was involved with the development of some form of this same network automation technology as one of its offering or services. Indeed, it was his expertise in this area that caught Digital Realty's attention and, at least in part, cemented Digital Realty's decision to acquire Pureport. While at Digital Realty, Sprygada continued to work on and advance this technology. Thus, while the approach and details of the three companies' development efforts may differ in some ways, all are on the same quest to capitalize on the market's need for next generation network automation services and products.[18]

75.    Digital Realty also contends that Sprygada's argument with respect to the scope of Section 8(a) of the ECCA misses the fundamental distinction that the noncompete in *Medical Staffing Network* arose out of the employment setting, and not from the sale of a business. It argues that the language defining the scope of the covenant before the Court is routinely enforced in the sale-of-business context, particularly with respect to former owners. The Company points out that Sprygada is not prevented from working for a competitor altogether, but only from working for a competitor in a capacity that would require him to perform the activities that

---

[18] Sprygada distinguishes Itential's strategic focus on products and services for network automation in hybrid environments from Digital Realty's ███████, which they describe as a network automation service that was intended to be limited to Plaintiffs' data center customers. The Court concludes only that the IT advancements at issue are sufficiently similar that Plaintiffs have shown a reasonable likelihood of success on the merits to satisfy Rule 65.

Pureport was performing when it was acquired. This distinction, they say, limits the scope of the covenant and makes it enforceable. (Reply Further Supp. Pls.' Mot. Prelim. Inj. 7, ECF No. 71.3.)

76. The Court agrees. The evidence currently before the Court establishes that Digital Realty purchased Pureport in part because of Sprygada's ideas, expertise, and know-how with respect to network automation. Digital Realty intended for the covenants to protect their investment. The Court concludes that Plaintiff have made a sufficient showing at this stage that the restrictions in Section 8(a) limiting Sprygada from engaging in the activities that Pureport was performing when it was acquired by Digital Realty are not facially unreasonable and were needed to protect the assets that Digital Realty purchased from Pureport. *See Cut N Up Hair Salon of Carolina Beach v. Bennett*, 2014 N.C. App. LEXIS 1031, at *11 (N.C. Ct. App. Sept. 6, 2014); *Keith*, 81 N.C. App. at 194–195; *Lunsford v. ViaOne Servs.*, 2020 NCBC LEXIS 111, at *8–13 (N.C. Super. Ct. Sept. 28, 2020).

77. Sprygada next contends that the geographical restriction in Subsection 8(a), which includes North Carolina, the United States, North and South America, Europe, Asia, Australia, and Africa, is oppressive, and that no legitimate business interest has been alleged that would justify a territorial restriction "extending to the entire habitable world." (Br. Supp. Def.'s Mot. J. Pldgs. 13–14.)

78. The Company responds that extensive territorial restrictions are not facially invalid when they are supported by facts. Where, as here, Digital Realty has presented evidence that its operations extend throughout the United States, Canada,

Europe, Latin America, Asia, Australia, and Africa, and Sprygada oversaw a division to develop products that would be used globally, the Company contends that the territorial restriction in the covenant, which tracks their areas of operation, is not overbroad. (Reply Further Supp. Pls.' Mot. Prelim. Inj. 9.)

79. A territorial restriction in a sale of business covenant will be found to be reasonable if it "encompasses the area served by the business that the covenant protects or, more specifically, if the protected business had clientele in the area covered by the covenant[.]" *Beverage Sys. of the Carolinas, LLC,* 368 N.C. at 697 (citations omitted).

80. Some elasticity exists when analyzing time and territory restrictions because they are read in tandem to determine their reasonableness. *See Farr Assocs.,* 138 N.C. App. at 280 ("In evaluating reasonableness as to time and territory restrictions . . . [a] longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa.*" (citing *Hartman,* 117 N.C. App. at 311–12 ("In evaluating reasonableness, the time and territory restrictions must be read in tandem[.]")); *Jewel Box Stores,* 272 N.C. at 665 (considering the elements of time and area in tandem when determining the reasonableness of a covenant not to compete pursuant to the sale of a retail jewelry business).

81. A three-year restriction such as the one found here is relatively short, allowing for the territory to be somewhat broader than would be true if the time restriction were longer. *Jewel Box Stores,* 272 N.C. at 663–64 (collecting cases and observing that the duration of noncompetition agreements in the sale-of-business

context can sometimes exceed "ten, fifteen, and twenty years, as well as limitations for the life of one of the parties"). While the restricted territory here is quite broad, under the circumstances of this case and at this stage of the litigation, the Court concludes that Plaintiff has made a showing sufficient to satisfy Rule 65 that the territorial restriction in Section 8(a) is necessary to protect its legitimate business interest in the assets it purchased.[19]

82. Accordingly, Digital Realty's Motion with respect to subsection 8(a) of the ECCA shall be granted.

### ii. Section 8(b) of the ECCA

83. Section 8(b) of the ECCA provides:

As a condition to Employee's acceptance of employment pursuant to the offer letter to which this Agreement is an exhibit, Employee agrees that during Employee's employment and for a period of two (2) years following the Last Day, Employee shall not, directly or indirectly, for or with a Competing Business, engage in any activity (as employee, owner, consultant, partner, or in any other capacity) that is the same as or similar to the Business of the Company and upon which Employee worked or which related to any direct or indirect responsibilities Employee had at the Company during the two (2) years prior to the Last Day. Employee understands that this restriction is limited to (a) the Restricted Territory or (b) anywhere in the word where Employee's activities for a Competing Business will require Employee to use and/or disclose the Company's Confidential Information or Trade Secrets.

---

[19] The Court is mindful of Judge Steelman's observations in a concurring opinion written more than eight years ago, that economic conditions are changing, and the economy, both in North Carolina and in the United States, is increasingly becoming a global one. Therefore, historic views of "reasonable" geographic limitations are also giving way to the understanding that competition may be occurring on a much wider basis. Consequently, limits with respect to territory, while still an important consideration, may, depending on the nature of the business, end up being less restrictive than those relating to time and scope of duties. *See, e.g., Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 571 (2014) (Steelman, J., concurring).

84. A noncompetition covenant governing employment is enforceable if it is (a) in writing; (b) made a part of a contract of employment; (c) based on reasonable consideration; (d) reasonable as to time and territory; and (e) not against public policy. *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 649–50 (1988).

85. Defendant contends that because of the covenant's definitions of "Company" to include both the REIT and DLR's "undefined subsidiaries and affiliates," and "Business of the Company" to include "any and all business or activities of the type engaged in by the Company," (which includes the business or activities of these undefined subsidiaries and affiliates), he is not able to discern the true scope of the restriction on his activities, rendering the covenant unenforceable. (Def.'s Opp'n Br. 10.) He adds that the expansive geographic restriction "extending to the entire habitable world" is unreasonable. (Def.'s Opp'n Br. 21.)

86. In response, Digital Realty first concedes that, unlike Subsection 8(a), this portion of the covenant *is* subject to the heightened scrutiny afforded such provisions in employment agreements and, therefore, the restriction should be tailored to protect only the legitimate business interests that arose as a result of Sprygada's employment.

87. The Company contends, however, that Defendant's argument regarding the scope of the restriction fails to consider and give effect to language that further defines those duties. Specifically, the duties must be the "same or similar to the Business of the Company," but they must also be duties "upon which Employee worked or which relate to any direct or indirect responsibilities Employee had at the

Company during the two (2) years prior to the Last Day." The latter limitation, they say, anchors the restriction to Sprygada's former duties and eliminates any overbreadth that might otherwise have resulted from the inclusion of unnamed "affiliates and subsidiaries." (Reply Further Supp. Pls.' Mot. Prelim. Inj. 6.) Digital Realty argues that this limiting language makes the scope of the covenant reasonable because Sprygada is not prevented from performing *any* activities for a competing business; he is prohibited only from performing those activities "upon which [he] worked" or "which [relate] to any direct or indirect responsibilities" he had at the Company during the two years prior to his resignation. (Reply Further Supp. Pls.' Mot. Prelim. Inj. 6.)

88. "Covenants not to compete between an employer and employee are not viewed favorably in modern law. To be valid, the restrictions on the employee's future employability by others must be no wider in scope than is necessary to protect the business of the employer." *VisionAIR, Inc.*, 167 N.C. App. at 508–509 (citations and internal quotation marks omitted) (refusing to enforce noncompete when the scope of the restriction purported to prevent the employee from "doing even wholly unrelated work at any firm similar to [his former employer]"). As the Supreme Court has observed:

> While it is true a contract by an employee not to engage in a certain business within a reasonable area and for a reasonable length of time, which does not affect the interest of the public, and is necessary to protect the employer, may be upheld, it is equally true that contracts restraining freedom of employment can be enforced only when they impose a reasonable restraint and are not wider in scope than is necessary for the protection to which the employer is entitled, and are not injurious to the public interest.

*Comfort Spring Corp. v. Burroughs*, 217 N.C. 658, 661 (1940) (citations omitted); *see also Horner Int'l Co.*, 232 N.C. App. at 566 (finding unenforceable covenant that was too broad in scope to protect legitimate business interests of former employer).

89.    A legitimate business interest exists: (1) if the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or (2) if the nature of the employment will enable the employee to acquire valuable information as to the nature and character of the business. *United Labs., Inc.*, 322 N.C. at 650 (citation omitted).

90.    Defining the scope of a noncompete by including unnamed affiliates and subsidiaries in the definition of "Company" is a perilous course. *See, e.g., Rel. Ins. Inc. v. Pilot Risk Mgmt. Consulting, LLC*, 2022 NCBC LEXIS 49, at *35 (N.C. Super. Ct. May 25, 2022) (holding in the context of a non-solicitation covenant that "such broad restrictions have been found to be unenforceable in that they do not protect the legitimate business interests of the employer"); *Medical Staffing Network, Inc.*, 194 N.C App. at 657 (finding no "legitimate business interest in preventing competition with, foreclosing the solicitation of clients and employees of, [or] protecting the confidential information of an unrestricted and undefined set of [the employer's] affiliated companies that engage in business distinct from the medical staffing business in which [the former employee] had been employed").

91.    And to the extent Digital Realty relies on this language to bring added clarity to the restriction, it disappoints. The prohibited duties are those "upon which Employee worked or *which relate to* any direct or *indirect responsibilities* Employee

had at the Company during the two (2) years prior to the Last Day." Nowhere in the ECCA is the term "indirect responsibilities" defined, leaving one to wonder how "indirect" those "responsibilities" may be. The phrase "which relate to," modifying "indirect responsibilities" makes the prohibited conduct even more attenuated from the duties Sprygada actually performed while employed with Digital Realty. *Cf. Azko Nobel Coatings, Inc.*, 2011 NCBC LEXIS 42, at *31–33 (observing that use of the term "directly or indirectly" can create impermissible overbreadth in covenants that arise from the employment relationship).

92. When the language describing the restricted duties strays from the employee's own duties and essentially restricts the employee from taking positions with a competitor that would not harm his former employer's legitimate business interests, it is too broad to be enforceable. *See, e.g., CopyPro, Inc. v. Musgrove*, 232 N.C. App. 194, 200 (2014); *Hartman*, 117 N.C. App. at 317. Likewise, when a restriction prevents an employee from developing products that, while competitive, are based on technology wholly unrelated to that upon which the employer's products are based, the restriction will not be enforced. *See, e.g., VisionAIR, Inc.*, 167 N.C. App. at 508–09 ("Under this covenant [the former employee] would not merely be prevented from engaging in work similar to that which he did for VisionAIR at VisionAIR competitors; [he] would be prevented from doing even wholly unrelated work at any firm similar to VisionAIR . . . . Such vast restrictions . . . cannot be enforced.").

93. Given the ambiguity of its language and the resulting impact on its scope, the Court concludes that the Company has not satisfied its burden to show that it is likely to succeed on the merits with respect to Section 8(b) of the ECCA, and, accordingly, the Court's analysis with respect to this portion of its contract claim ends here. *See id.* at 508 ("The courts will not rewrite a contract if it is too broad but will simply not enforce it." (quoting *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528 (1989))).

### B. Irreparable Loss and Balancing of the Equities

94. Having determined that Digital Realty has established a likelihood of success on its claim with respect to Section 8(a), the Court turns to whether the Company has shown that it is likely to sustain irreparable loss unless the injunction is issued. If so, the Court must weigh that potential harm against the harm to Sprygada if an injunction is entered. *See Addison Whitney, LLC*, 2017 NCBC LEXIS 23, at *12–13.

95. "Irreparable injury" is not necessarily injury that is "beyond the possibility of repair or possible compensation in damages," but rather it is "one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *A.E.P. Indus., Inc.*, 308 N.C. at 407 (citing *Barrier v. Troutman*, 231 N.C. 47, 50 (1949)); *Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 41, *23 (N. C. Super. Ct. Apr. 17, 2018).

96.     Defendant argues that Digital Realty's delay in bringing the Motion belies their contention that they are suffering irreparable harm. Indeed, it is generally true that a significant measure of irreparable harm is "the haste with which the moving party seeks injunctive relief." *Global Textile All., Inc. v. TDI Worldwide, LLC*, 2017 NCBC LEXIS 108, at *30 (N.C. Super. Ct. Nov. 21, 2017) (collecting cases).

97.     In this case, Sprygada gave notice of his resignation to go to Itential in July 2021 and left a few weeks later on 13 August 2021. (Sprygada Aff. ¶¶ 37–38.) After being reminded of his noncompetition obligations by letter from Digital Realty's counsel dated 25 August 2021, Defendant, in his written response, assured the Company that he was not engaged in work with Itential that was contrary to his contractual obligations. (Sprygada Aff. ¶ 39.)[20] Even so, in his LinkedIn.com biography, Sprygada described his role at Itential in language that gave Digital Realty pause. Consequently, the Company filed suit in November 2021 and included a request for injunctive relief.

98.     The parties agreed to expedited discovery, (*see* ECF No. 58, at 3), but a disagreement regarding the terms of a possible consent protective order slowed the exchange of discovery until this Court's Order of 10 March 2022 resolving the dispute, (ECF No. 34). Digital Realty contends that the delayed discovery responses, as well as Sprygada's public statements made in March 2022, tipped the balance with respect

---

[20] At the hearing, both parties referenced a letter Sprygada wrote in response to the admonition letter sent by Plaintiffs' counsel. In his response, Sprygada apparently distinguished his duties at Itential from the restricted duties. However, Sprygada's response letter is not in the record and, therefore, not considered by the Court.

to their concern that—despite his assurances otherwise—Sprygada was, in fact, violating the ECCA. This Motion followed on 19 April 2022.

99. Under the particular circumstances of this case, the Court concludes, in its discretion, that Digital Realty's delay in seeking injunctive relief was not unreasonable.

100. The Court further concludes that Digital Realty has suffered, or will suffer, financial harm as a consequence of Sprygada's decision to join Itential in a role that includes responsibilities for the development and marketing of network automation products and services. These damages, however, are difficult to ascertain with certainty, making injunctive relief appropriate. Sprygada acknowledged as much in the language of the ECCA: "Because Employee's services are personal and unique and because Employee may have access to and become acquainted with proprietary information, Confidential Information, Trade Secrets and third party information, the Company shall have the right to enforce this Agreement and any of its provisions by injunction[.]" (Empl. Agr., at § 11.); *see also, e.g., A.E.P Indus., Inc.,* 308 N.C. at 406 (analyzing similar language when considering the inadequacy of money damages).

101. Given his commitment to Digital Realty in Section 8(a) of the ECCA, the Court concludes that if Sprygada were permitted to engage in activity that is the same or similar to Pureport's business or activities at the time of the closing, the injury would be of such continuous and frequent recurrence that no reasonable

redress could be had in a court of law. Accordingly, Digital Realty has shown the existence of irreparable harm.

102. Nevertheless, whether an injunction shall issue is a matter within the discretion of the Court. In exercising this discretion, "[a] court of equity must weigh all relevant facts before resorting to the extraordinary remedy of an injunction." *Travenol Labs., Inc., v. Turner*, 30 N.C. App. 686, 694 (1976). In this "balancing process," the Court weighs the potential harm to the plaintiff if the injunction is not granted against the potential harm to the defendant if injunctive relief is granted. *See, e.g., Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 16 (1993). "In effect, the harm alleged by the plaintiff must satisfy a standard of relative substantiality as well as irreparability." *Williams*, 36 N.C. App. at 86.

103. The Court has engaged in this balancing process and concludes that the potential harm to Digital Realty if the injunction is not issued outweighs the potential harm to Sprygada if it is. Digital Realty's purchase of Pureport's assets specifically contemplated the development of next generation network automation products and services, at least in part as envisioned by Sprygada. For Sprygada to develop the same or similar advances for a competitor would devalue Digital Realty's purchase of Pureport and has the potential to harm its relative position in the network automation market. As the Supreme Court has observed, "Freedom to contract must not be unreasonably abridged. Neither must the right to protect by reasonable restrictions that which a man by industry, skill and good judgment has built up, be denied." *Scott v. Gillis*, 197 N.C. 223, 228 (1929) (citation omitted).

104. The Court observes that Sprygada is, by all accounts, a talented information technology professional capable of performing any number of valuable positions in the industry while also keeping his contractual commitment to Digital Realty. An injunction tailored to enforce Section 8(a) will not render him unemployable.

### C. Public Policy Considerations

105. Finally, an injunction enforcing Section 8(a) would support the parties' fundamental freedom to enter into contracts. *See United Labs., Inc.*, 322 N.C. at 649 ("Essentially, by enforcing the restrictions a court is only requiring defendant to do what he agreed to do." (citation omitted)). "It is as much a matter of public concern to see that valid covenants are observed as it is to frustrate oppressive ones." *Id.* (alteration omitted). It is also consistent with the State's policy to encourage growth in the "high tech" industry. *See A.E.P. Indus., Inc.*, 303 NC at 410.

106. Accordingly, in its discretion, the Court GRANTS Digital Realty's Motion for Preliminary Injunction ENJOINING Defendant from, either directly or by assisting others, engaging in any activity that is the same or similar to the design, development, maintenance, support, marketing, licensing, distribution, commercialization, sale, or operation of any offerings and/or services related to cloud network solutions, including solutions that allow organizations to connect workloads or data centers running in separate clouds, to the extent Pureport engaged in those activities at the time its assets were acquired by Digital Realty on 10 February 2021, and if Defendant would be engaging in those activities for or with an individual or

entity that is engaged in or taking material steps to engage in the types of business activities in which Digital Realty is engaged. Any persons or entities in active concert or participation with him are enjoined from assisting him to avoid his obligations pursuant to this Order. This restriction applies to Sprygada's activities within North America, South America, Europe, Asia, Australia, and Africa.

107. In determining the amount of security, the Court may consider whether the applicant for equitable relief has assets and would be able to respond in damages if the defendant suffers damages as a result of being wrongfully enjoined. *Stevens v. Henry*, 121 N.C. App. 150, 154 (1995). Here, the Court concludes, based on publicly available information, that Digital Realty has the means to respond in damages should they be required to do so. Furthermore, the Court is not convinced that the restriction on Sprygada's employment cannot be mitigated by him. Consequently, the Court declines Sprygada's request that bond be set in the amount of his wages for a two-year period and concludes, in the exercise of its discretion, that security of $50,000.00 is reasonable and appropriate under the circumstances as a condition of granting this preliminary injunction.

## IV. CONCLUSION

108. WHEREFORE, based on the foregoing Findings of Fact and Conclusions of Law, the Court, in its discretion hereby ORDERS that, pending resolution of this action, and until otherwise ordered by this Court:

   a. Defendant is ENJOINED from, either directly or by assisting others, engaging in any activity that is the same or similar to the

design, development, maintenance, support, marketing, licensing, distribution, commercialization, sale, or operation of any offerings and/or services related to cloud network solutions, including solutions that allow organizations to connect workloads or data centers running in separate clouds, to the extent Pureport engaged in those activities at the time its assets were acquired by Digital Realty on 10 February 2021, and if Defendant would be engaging in those activities for or with an individual or entity that is engaged in or taking material steps to engage in the types of business activities in which Digital Realty is engaged. Any persons or entities in active concert or participation with him are enjoined from assisting him to avoid his obligations pursuant to this Order. This restriction applies to Sprygada's activities within North America, South America, Europe, Asia, Australia, and Africa.

b. This Order shall become effective upon the Company's posting of security in the amount of $50,000.00, which the Court concludes, in its discretion, is reasonable and appropriate as a condition of granting the preliminary injunction. *See* N.C.G.S. § 1A-1, N.C. R. Civ. P. 65(c). Any party may move to adjust the amount of the security required upon a showing of good cause.

c. Except as herein GRANTED, the Motion is DENIED.

IT IS SO ORDERED, this the 1st day of July, 2022.

/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
  For Complex Business Cases